UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

MOTIVA PERFORMANCE                                    Case No. 19-12539-t7
ENGINEERING, LLC,

      Debtor.

PHILIP MONTOYA, Trustee,

      Plaintiff,

v.                                                    Adv. Pro. No. 21-1026-t

WILLIAM S. FERGUSON, DEALERBANK
FINANCIAL SERVICES, LTD,
ARMAGEDDON HIGH PERFORMANCE
SOLUTIONS, LLC, ARMAGEDDON TOOL
& DIE, LTD, AVATAR RECOVERIES, LLC,
and DAVID ROCHAU,

      Defendants.

**<u>OPINION</u>**

The Court tried the merits of this turnover/fraudulent transfer/veil-piercing/breach of duty

proceeding and now rules on each claim. Counsel for the parties did a commendable job presenting

the evidence and arguing their clients' positions. For the reasons set forth below, the Court finds

in Plaintiff's favor on Counts II, III, IV, V, VI, VII, and VIII.

I.     <u>FACTS</u>[1]

---

[1] The Court takes judicial notice of its docket and of relevant public records, including the docket
in *Creig Butler v. Motiva Performance Engineering, LLC, et al.*, Case No. D-202-CV-2017-01393,
pending in the Second Judicial District of New Mexico (the "State Court Action"). *See St. Louis
Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may
sua sponte take judicial notice of its docket and of facts that are part of public records). The Court
also takes judicial notice of the publicly available corporate/LLC information on the New Mexico
Secretary of State's website.

The Court finds:[2]

<u>Ferguson</u>

William Ferguson is a well-known local attorney and car aficionado. He is the sole or majority owner of the following New Mexico entities: Will Ferguson and Associates ("WFA"); Motiva Performance Engineering, LLC ("Motiva"); Armageddon High Performance Solutions, LLC ("Turbo"); Armageddon Tool & Die, LTD (Armageddon"); Avatar Recoveries, LLC ("Avatar"); and Dealerbank Financial Services, Ltd. ("Dealerbank"). Through Armageddon and the other entities he owns, Ferguson invests in collectible cars, real estate, and many other ventures. He is a very successful, self-made man. It is apparent from his trial testimony that he is intelligent, organized, and hard-working.

<u>Will Ferguson & Associates</u>

WFA is an Albuquerque-based personal injury law firm, owned solely by Ferguson. WFA sometimes pays Ferguson's personal expenses. In such cases, the payments are supposed to be shown as distributions to Ferguson and included in Ferguson's gross income for tax purposes. The accounting is imperfect. For example, Ferguson could not produce an accounting record that a $10,000 wire transfer from WFA to Walker & Associates on November 1, 2019, was treated as a distribution to him, even though Ferguson testified that WFA made the payment on his behalf.

<u>Armageddon Tool & Die</u>

In the 1980s Armageddon was a Class III firearms dealer, which included the sale of destructive devices. Armageddon allowed its dealer license to lapse in 1988 or so and eventually it became a "shell," with no active business operations. At some point Ferguson, its sole owner,

---

[2] Some of the Court's findings are in the discussion section of the opinion. They are incorporated by this reference.

starting using Armageddon as an investment "bucket" (his term) for a number of his businesses and investments. Ferguson gave Main Bank a list of entities he controlled and asked the bank to deposit checks written to those entities into Armageddon's bank account. The bank agreed. In 2016, the receipts and disbursements of about 30 of Ferguson's businesses/investments ran through Armageddon's account at Main Bank.

In addition to its role as a clearinghouse for Ferguson's businesses, Armageddon owns a commercial building on General Patch Street in Albuquerque, and is shown as the owner of a large number of collectible cars (the 2020 book value was about $3,900,000). Armageddon has no interest in Motiva, Turbo, Dealerbank, or Avatar.

Using Armageddon's business account, Ferguson buys, restores, and sells collectible cars, especially foreign sports and luxury cars. Ferguson owns about 70 cars at a given time. Ferguson testified that he has "always made money buying and selling cars." Ferguson's accountant, Ron Kirkpatrick, created a spreadsheet to track Ferguson's car collection. The spreadsheet for the year ended December 31, 2019, listed 74 cars. Most of the cars were paid for from Armageddon's checking account, while some were paid for directly by Ferguson.

Motiva

Ferguson formed Motiva on April 11, 2007, to acquire the assets of Speed Dreams, a "speed shop." Motiva made high-level performance modifications to customers' cars, using after-market parts. Motiva had at least one car dealer license and, for a time, a showroom from which it sold cars, including some of Ferguson's cars.

When formed, Motiva had three members: Ferguson (70%), David Rochau (15%), and Michael Smith (15%). Ferguson was Motiva's only manager.[3] Mr. Smith later left Motiva. It is not

---

[3] The articles of organization provide that Motiva can have only one manager.

clear what happened to his 15% membership interest. By November 2019, however, the membership structure was represented to be: Ferguson (65%); Rochau (25%); and Scott Fox (10%). There are no company records to verify this.

According to Rochau, he became the manager of Motiva in May or June 2019, after Motiva had shut down. He signed Motiva's bankruptcy petition on October 31, 2019, as the managing member and testified as such at Motiva's § 341 meeting. However, Ferguson signed a promissory note dated October 21, 2019, as Motiva's manager, and transferred the title of two cars from Motiva to Armageddon in August 2019, presumably acting as Motiva's manager. This inconsistency was not explained.

Ferguson was the only source of capital for Motiva. Over the years, he invested nearly $725,000 in the business. All of Ferguson's investments were reflected as loans on Motiva's books and records. Ferguson always viewed his Motiva investments as loans. Rochau also understood that Ferguson's investments in Motiva were loans. At Motiva's §341 meeting, Ferguson testified that the money he invested in Motiva was loaned, and that some of it had been repaid. Motiva's bankruptcy schedules state that Ferguson is a creditor with respect to all amounts invested in the business. Despite that, at trial Ferguson took the position that his investments over the years were capital contributions and should be treated as equity rather than debt.

Unless the Court recharacterizes Ferguson's loans as equity, Motiva has never been solvent on a balance sheet basis.[4] Ferguson and/or Rochau stated under penalty of perjury a number of times that Ferguson capitalized Motiva with loans, not equity. They must stand by those sworn statements. Until it became clear that Ferguson would be better off to assert that his investment

---

[4] For this finding, any fraudulently transferred assets are not considered. *See* 11 U.S.C. § 101(32)(A).

-4-

Case 21-01026-t    Doc 105    Filed 10/07/22    Entered 10/07/22 15:42:52 Page 4 of 34

was equity, he always said it was debt. The Court will not recharacterize the loans as equity. Thus, the Court finds that throughout its life and in particular in 2018 and 2019, Motiva was substantially insolvent on a balance sheet basis.

Motiva was not a profitable business. Between January 1, 2012, and December 31, 2018, Motiva lost about $339,500. Furthermore, Motiva had no committed funding source. Ferguson could stop funding Motiva at any time, which he did after losing the State Court Action. Motiva stayed in business at Ferguson's sufferance.

Motiva's chronic insolvency and undercapitalization was partly the result of the nature and quality of the assets it carried on its books (accounts receivable, inventory, equipment, and leasehold improvements). After Motiva shut down, the assets turned out to be worthless. Ferguson operated Motiva in such a way that it could never pay a significant unforeseen liability unless Ferguson decided to have Motiva paid it.

Motiva was insolvent in 2018 and 2019 even if Ferguson's investment in Motiva is recharacterized as equity. By November 1, 2018, Motiva had only a few worthless assets and substantial liabilities.

Ferguson and Rochau agreed that, until Ferguson's loans to Motiva had been repaid, Ferguson could treat Motiva as owned solely by him for income tax purposes. They further agreed that, if and when Motiva repaid Ferguson in full and was making money, Ferguson would become a minority member of Motiva, while Rochau would become the majority member. None of this was ever put in writing.

The lack of a written agreement between Ferguson and Rochau about how to allocate Motiva's losses for income tax purposes is just one example of Motiva's grossly inadequate business records. There is no operating agreement, although one is referred to in the articles of

organization. There is no minute book. No membership interest certificates are in the record, nor is there a membership transfer ledger. After Motiva's articles were filed on April 11, 2007, no further documents were ever created to document the company's ownership, management decisions, or internal operations, or to document agreements among the members.

Motiva moved into a building owned by Avatar in about 2010 and remained there until Motiva shut down in 2018. The record includes a written lease between Avatar and Motiva, dated January 14, 2013. There is only one signature: Ferguson signed the lease as "managing member," without identifying whether he was signing for Motiva, Avatar, or both. In another oddity, Ferguson's signature was notarized on January 14, 2014, one year after the lease date. The monthly rent was $5,000. Motiva did not pay Avatar as agreed, apparently, as Avatar filed a proof of claim for $135,000 in past due rent. Avatar did not attach a copy of the lease to its claim.

### Turbo

In 2011, Ferguson and Rochau decided to develop an aftermarket turbocharging system for the new Ford 5.0 V8 engine. Rochau had experience designing turbocharging systems and thought he could make money developing an aftermarket system. He convinced Ferguson it was a worthwhile enterprise. Ferguson and Rochau testified that they always intended the turbo venture to be separate from Motiva. As with Motiva, however, they were lax about paperwork. In fact, from 2011 until March 3, 2017, there was no separate entity for the turbo project, nor any writing memorializing the parties' agreement or understanding about the venture.

Ferguson and Rochau took over an existing but unused Motiva bank account for the turbo project. Because the account was in Motiva's name and no entity had been formed for the project, checks payable on account of the turbo project were made out to Motiva and deposited into the account. That did not change until 2017.

Rochau began working on the project in Armageddon's building on General Patch Street. He kept track of the expenses associated with the project and created a Quickbooks file for the venture, including balance sheets and profit and loss statements. These he periodically sent to Russell Kauslaric, Ferguson's bookkeeper. The project did not have employees or file income tax returns. Ferguson's substantial capital investments in the project were treated on Ferguson's income tax returns as Motiva's expenses.

Ferguson invested $777,004 in the turbo project through December 31, 2017. His investments were accounted for as capital contributions. The investments were made over a number of years: $82,204 by 12/31/2015; an additional $575,082 in 2016; and about $119,718 in 2017.

Ferguson finally organized Turbo as a limited liability company on March 3, 2017. By then Ferguson had invested $657,286 in the project. The articles of organization are not in the record. The New Mexico Secretary of State website shows Ferguson as the sole manager and member at the time of organization.

Ferguson and Rochau were not clear about who owned Turbo. In April 2022, in response to an interrogatory asking Turbo to identify all officers and members, Turbo stated: "when the LLC was formed Will Ferguson had the majority interest, Josh Stroud had [sic] Rochau had minority interests. Josh left the company and his ownership interest as of October 1, 2018. In 2021 Chris Clark joined the company. The ownership is presently divided evenly between the three members."

The following facts are inconsistent with Ferguson's and Rochau's position that the turbo project was separate from Motiva:

- Turbo's bank account was a Motiva account;

- Motiva's name and/or address appears on purchase orders and invoices for the purchase of "Motiva Armageddon Twin Turbo Kits" or "Mot-Arm;"
- In email correspondence from Rochau in 2015, his signature block showed he was President of Motiva Performance Engineering, LLC and program director of Armageddon Turbo Systems;
- Motiva authorized EZ Export Inc. to screen cargo shipped to "Motiva Performance dba Armageddon Turbo Systems;
- Motiva's name was used prominently in a YouTube video promoting the turbo kits;
- Rochau's email address when he was working on the turbo project was drochau@motivaperformance.com;
- The turbo kits were stored at Motiva's business premises;
- Turbo moved into Motiva's business premises in 2015;
- Turbo used Motiva's mailing address from time to time;
- Motiva often purchased goods for Turbo, and was repaid by Turbo; and
- Turbo's 2020 Schedule C, which states that Ferguson started or acquired Turbo in 2020.

After Motiva shut down, Turbo may have signed a lease with Avatar. At any rate, the first page of a lease, and an exhibit outlining the areas leased, were produced by Turbo to the Plaintiff. Ferguson could not locate the signature page.

### Ferguson's Use of Motiva's Dealer License to Buy Cars

New Mexico imposes a 4% excise tax on the sale of motor vehicles in the state. NMSA § 7-14-4 and 4.[5] However, a New Mexico car dealer may avoid the excise tax if the car is registered with a "dealer plate," NMSA § 66-3-401(A). Alternatively,

> a dealer may register and title a vehicle included in a dealer's inventory in the name of the dealer upon payment of the registration fee applicable to that vehicle, but without payment of the motor vehicle excise tax, provided the vehicle is subsequently sold or leased in the ordinary course of business in a transaction subject to the motor vehicle excise tax or the leased vehicle gross receipts tax.

NMSA § 66-3-401(D). Because dealers do not have to pay excise tax on cars in their inventory, a dealer may not "lease, loan, transfer or sell its license to another person, and no person shall use the license of any other person for any purpose." NMSA § 66-4-2.

---

[5] On July 1, 2019, the excise tax rate increased from 3% to 4%.

To avoid paying excise tax, Ferguson frequently used Motiva's dealer license to buy his cars. The evidence in this proceeding is that Ferguson bought at least 23 cars using Motiva's dealer license. Among these were a Rolls Royce Ghost; a 2012 Ferrari FF;[6] a 1971 Jaguar XK-E (4796); a 1970 Jaguar XK-E (3591); and a 2005 Toyota Tundra (together, the "Original Cars"),[7] as well as a 1936 Packard convertible, a 1969 Jaguar XK-E (5905), a 1970 Jaguar XK-E (7933), and a 2013 Ferrari California (together, the "Additional Cars") (the Original Cars and the Additional Cars are referred to as the "Subject Cars").

Rochau was not aware of Ferguson's use of Motiva's dealer license to buy cars. There is no evidence that Rochau ever used Motiva's dealer license improperly.

### The Butler Litigation

In February 2014, Creig Butler hired Motiva to upgrade a 2009 Hummer H3TX. The work did not go well. Butler sued Motiva on February 28, 2017, commencing the State Court Action. In his complaint, Butler alleged that Motiva agreed to upgrade the Hummer for $20,000 but that, two years and $70,000 later, the Hummer was unsafe to drive and good only for parts. The allegations in Butler's complaint, if true, show that Motiva treated him very shabbily indeed.

Motiva retained WFA to defend it against Butler's claims. On October 26, 2018, after a four-day jury trial, the jury returned a verdict against Motiva for $292,001 plus costs, attorney

---

[6] Motiva bought the Ferrari FF in December 2014 for $200,000, with Ferguson's money. Ferguson drove it. In August 2016 someone backed into the Ferrari in WFA's parking lot, causing damage. Motiva sued the driver, alleging that Motiva "owned and operated" the Ferrari. WFA represented Motiva. The claim ultimately was settled for $40,950 (the "Settlement Proceeds"). The settlement check was made out to Ferguson and Motiva. Ferguson deposited the Settlement Proceeds into his personal account.

[7] The Original Cars do not include the 2009 Aston Martin because it was transferred on March 15, 2016, outside of the state or federal "reachback" period for fraudulent transfers.

fees, and post-judgment interest. The judgment was increased on April 3, 2019, to $337,317.90, which included an award of attorney fees and costs.

Ferguson's Response to the Jury Verdict

The judgment caught Ferguson by surprise--he thought Butler's claims were "spurious." It created an awkward situation for him, as Motiva held title to the Subject Cars, all of which had been purchased using his money. Awkward or not, Ferguson acted quickly: on November 1, 2018, he transferred title to the following cars from Motiva to Dealerbank:

| Date | Car | Acquisition Cost | Transferee | Sales Price |
|------|-----|------------------|------------|-------------|
| 11/1/2018 | Rolls Royce Ghost | $130,000 | Dealerbank | $100,000 |
| 11/1/2018 | 1936 Packard conv. | $222,000 | Dealerbank | $ 50,000 |
| 11/1/2018 | 1969 Jaguar XK-E (5905) | $ 38,166 | Dealerbank | $  6,000 |
| 11/1/2018 | 2012 Ferrari FF | $170,000 | Dealerbank | $unknown |
| 11/1/2018 | 1970 Jaguar XK-E (7933) | $ 49,000 | Dealerbank | $  6,000 |
| Total | | $609,166 | | $162,000 |

No money changed hands.

Ferguson Shuts Down Motiva

Ferguson testified that Motiva closed in about October 2018. In December 2018 Butler garnished Motiva's bank account, obtaining $2,914.99. The last Quickbooks transactions recorded for Motiva were in August 2018.

Ferguson testified that Motiva closed because of the Butler judgment. However, he admitted that the business model of doing "elaborate modifications to people's cars, custom work, in "not a rich" town was "a bridge too far."

The state court issued a writ of execution against Motiva on November 26, 2018. When the sheriff tried to execute the writ at Motiva's premises on December 5, 2019, and in particular when he tried to seize about 50 boxed "pipe kits" at the premises, an employee advised the sheriff

that Motiva had ceased operations that that the pipe kits belongs to Turbo. Ferguson then arrived. He contradicted the employee, stating that the kits belonged to Motiva and were subject to Avatar's landlord lien. Then, according to the sheriff's deputy executing the writ, Ferguson changed his position about ownership of the turbo kits. The upshot was that the sheriff's deputy returned the writ unsatisfied.[8]

In the meantime, Butler had gotten wind of the Ferrari FF. On April 9, 2019, Butler filed, inter alia, an application for a preliminary injunction, asking the state court to prevent Motiva from transferring the Ferrari FF or the pipe kit inventory. The state court heard the matter on April 18, 2019, and orally granted the application, instructing the parties to submit an agreed-upon form of preliminary injunction. The injunction was entered May 7, 2019. While counsel were negotiating the form of the injunction, however, Ferguson borrowed $120,000 from Main Bank and caused Dealerbank to pledge the Ferrari FF as collateral for the loan. Ferguson used the loan proceeds to pay down a personal line of credit.

Butler also sought to join Ferguson, Turbo, and Dealerbank as "relief defendants" in the State Court Action, so their conflicting claims to the Ferrari FF and the pipe kit inventory could be sorted out. Butler asserted that Motiva owned the Ferrari FF and the pipe kits. Motiva and the relief defendants, all of whom were represented by WFA, disagreed, arguing that Ferguson owned the Ferrari FF and that Turbo owned the pipe kits. The state court heard the matter in October 2019. On October 28, 2019, the state court issued a lengthy decision in which he ruled that Motiva owned the Ferrari FF and the pipe kits. The court also ordered Ferguson to give Motiva the Settlement Proceeds.

---

[8] Ultimately, Ferguson settled on the position that Turbo, rather than Motiva, owned the pipe kits.

While these ownership questions were being litigated, Ferguson continued to transfer cars titled to Motiva:

| Date | Car | Acquisition Cost | Transferee | Sales Price |
|------|-----|------------------|------------|-------------|
| 1/15/19 | 2016 Chev. Camaro | $47,688 | Dennis Miller[9] | $35,000 |
| 3/26/19 | 2013 Ferrari California | $125,000 | Dealerbank | $100,000 |
| 4/1/19 | 2005 Toyota Tundra | $3,500[10] | Armageddon | $3,500 |
| 8/7/19 | 1971 Jaguar XK-E (4796) | $46,601 | Ferguson | $8,200 |
| 8/21/19 | 1970 Jaguar XK-E (3591) | $45,000 | Ferguson | $8,900 |
| Total: | | $267,789 | | $155,600 |

On November 1, 2019, WFA wired $10,000 to the Walker & Associates trust account. This bankruptcy case was filed the same day. The following February, Ferguson transferred $30,950 to the debtor.

The case was converted to chapter 7 on April 15, 2020. Phillip Montoya (the "Plaintiff" or "Trustee") was appointed the chapter 7 trustee. Plaintiff filed this adversary proceeding on September 2, 2021.

Court Sanctions

The state court was unhappy with Ferguson for, inter alia, transferring the Ferrari FF to Dealerbank; encumbering the Ferrari FF after the preliminary injunction hearing; taking the position, at different times, that first Motiva and then Ferguson owned the Ferrari FF; and changing his position about ownership of the pipe kits. On January 5, 2021, the state court entered an order of civil contempt, containing extensive findings of fact and conclusions of law.

---

[9] Apparently an unrelated third party.

[10] There is no evidence about how much Motiva paid for the Toyota Tundra, so the Court will use the amount declared when it "sold" the truck to Armageddon.

On June 10, 2021, the New Mexico Supreme Court censured Ferguson, suspended him from the practice of law for 90 days, and required him to take a professional responsibility examination. The Supreme Court focused on Ferguson's treatment of the Ferrari FF:

> Mr. Ferguson purchased, titled, and registered the Ferrari in the name of his car dealership, Motiva, to obtain a personal benefit. He did so with the full intention to use the Ferrari as his personal vehicle but, at the same time, he avoided paying $6,000 in excise tax because he represented that Motiva, a car dealership, owned the car. He again claimed that Motiva owned the Ferrari when he sued his tenant for damaging it, and by suing on Motiva's behalf, he felt he could avoid personal reputational harm from suing his paraplegic tenant for actual and punitive damages over minor damages to the Ferrari. In these situations, including in a court of law, Mr. Ferguson represented unequivocally that Motiva owned the Ferrari.
>
> On the other hand, when Motiva's ownership of the Ferrari would mean a financial loss, Mr. Ferguson explicitly denied before a court of law the very same fact that he had previously asserted in a different court-that Motiva owned the Ferrari. We agree with the disciplinary board that both of these statements cannot be true.

<u>Ferguson's Tax Treatment of Motiva and Turbo</u>

Motiva appears on Ferguson's income tax returns as a "disregarded entity," indicating that Ferguson is the sole owner. At trial, Ferguson's accountant testified that it was improper to treat Motiva as a disregarded entity, given that it had two other members. Motiva should have filed state and federal income tax returns. It never did.

Ferguson's income tax returns for 2016-2019 do not mention Turbo. However, the 2016-2018 returns include Schedule Cs for Motiva.[11] Motiva's Schedule C attached to Ferguson's 2016 income tax return includes a $575,082 "research and experimental" expense. The record makes

---

[11] Schedule Cs are attached to federal income tax returns to disclose profits or losses from sole proprietorships owned by the taxpayer.

clear that these funds were invested by Ferguson in the turbo project. Motiva's 2017 and 2018 Schedule Cs also appear to include income and/or expenses for the turbo project.[12]

Motiva's 2016 Schedule C state that it uses cash basis accounting. That was switched in 2017 to accrual basis accounting.[13] Motiva's 2018 Schedule C includes legal and professional services of $215,699, no doubt from the Butler litigation. Motiva did not pay the legal fees. If WFA did not include the unpaid fees as income, then deducting the fees likely was improper.

Neither Turbo nor Motiva appears in Ferguson's 2019 tax return. In 2020, however, both do. Motiva's Schedule C reflects receipt of the Settlement Proceeds. The funds were treated as a "return or allowance," creating a $40,950 loss. That clearly is incorrect.

Turbo first appears on Ferguson's income tax returns in 2020. A 2020 Schedule C states that Turbo is a sole proprietorship (contrary to Ferguson's and Rochau's testimony). The schedule also says that Ferguson "started or acquired the business during 2020."

<u>Ferguson's Changes of Position</u>

Ferguson took the following positions with the taxing authorities and others:

- Motiva owned the Ferrari FF and all the other cars it purchased;
- The cars owned by Motiva were worth what Motiva paid for them;
- Ferguson was the sole owner of Motiva;
- Motiva invested at least $575,000 in the turbo project;
- Motiva was intimately involved in the turbo project;
- Motiva was and always had been insolvent;
- Ferguson loaned $725,000 to Motiva;
- Motiva uses cash basis accounting;
- Ferguson and Rochau were partners in the turbo project;
- The turbo project started in 2011 and was formally organized in 2017; and
- Once formally organized, Turbo had three members.

---

[12] The income and expense figures on Motiva's 2018 and 2018 schedule Cs do not match up to Motiva's internal financial statements. The Court finds that the difference can be attributed, in part, to including the turbo projects activity in Motiva's schedule Cs.

[13] A taxpayer must obtain IRS's consent before switching accounting methods. *See, e.g.,* IRS Publication 538, p. 18; and Form 3115. There is no evidence showing whether such permission was obtained.

At points convenient to him, Ferguson reversed his position in each of these instances:

- Motiva did not own the Ferrari or any of the other cars in its name;
- The cars titled in Motiva's name were worth much less than what Motiva paid for them;
- Ferguson, Rochau, and Scott Fox own Motiva;
- Motiva did not invest any money in the turbo project;
- Motiva had nothing to do with the turbo project;
- The $725,000 invested in Motiva was a capital contribution, not a loan;
- Motiva uses accrual basis accounting;
- Motiva was and had been solvent;
- Ferguson is the sole owner of Turbo; and
- Ferguson started or acquired Turbo in 2020.

In every case, the position taken by Ferguson before the Butler judgment benefited, or at least did not hurt, him. Similarly, in every case Ferguson's change of position *after* the Butler judgment also benefited him.

## II.     DISCUSSION

### A.     Plaintiff's Post-Trial Motion to Amend.

In closing argument Plaintiff moved, pursuant to Fed. R. Civ. P. ("Rule") 15(b)(2) and Fed. R. Bankr. P. 7015, to amend Counts II and IV to include the Additional Cars. Defendants opposed the motion. Rule 15(b) provides:

> When an issue not raised by the pleadings is tried by the parties; express or implied consent, it must be treated in all respect as if raised in the pleadings. A party may move-at any time, even after judgment-to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

"Implied consent is found where the parties recognized that the issue entered the case at trail and acquiesced in the introduction of evidence on that issue without objection." *Moncrief v. Williston Basin Interstate Pipeline*, 174 F.3d 1150, 1161 (10th Cir. 1999), quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982). "When the evidence claimed to show that an issue was tried by consent is relevant to an issue already in the case, and there is no

-15-

indication that the party presenting the evidence intended thereby to raise a new issue, amendment may be denied in the discretion of the trial court." *Hardin*, 691 F.2d at 457 (citing cases); *Koch v. Koch Indus.*, 203 F.3d 1202, 1217 (10th Cir. 2000) (citing *Hardin*). In addition, "Consent will . . . be found when the party opposing the amendment himself produces evidence on the new issue." *Hardin*, 691 F.2d at 457.

Here, Plaintiff's and Defendants' voluminous exhibits both included documents relating to the Additional Cars. Plaintiff found out shortly before trial that Motiva had transferred the Additional Cars after entry of the Butler judgment, without receiving any compensation for the transfers. Plaintiff questioned Ferguson and Rochau about the Additional Cars. Defendants did not object. Defendants point out, however, that the evidence introduced about the Additional Cars was relevant to Plaintiff's veil-piercing/alter ego claim. That is true. Nevertheless, it was clear from the trial examination and argument that Plaintiff intended to, and did, argue that the Additional Cars were fraudulently transferred from Motiva in reaction to the Butler judgment, so they would not be available to help pay Motiva's debt to Butler. Defendants did not object.

Furthermore, seeking to avoid the transfer of the Additional Cars is not a new claim or "issue" within the meaning of Rule 15(b)(2). Plaintiff does not seek to add a new cause of action, merely to apply existing causes of action to newly discovered transfers. The transfers of the Additional Cars were just like the transfers of the Original Cars. Defendants did not need additional discovery or other pretrial preparation to address the transfer of the Additional Cars.

The Court's review of the case law on Rule 15(b)(2) shows that, when appellate courts hold that amendments by implied consent are not appropriate, the amendments relate to new causes of action, rather than to the expansion of existing claims. *Compare In re Vickery*, 488 B.R. 680, 694-95 (10th Cir. BAP 2013) (declining to amend the complaint under Rule 15(b)(2) to add a claim

for embezzlement); *In re Fustolo*, 896 F.3d 76, 90 (1st Cir. 2018) (reversing the bankruptcy court for granting a Rule 15(b) motion to add an unpled § 727(a)(6) claim); *Dan Ryan Builders, Inc. v. Crystal Ridge Development, Inc.*, 783 F.3d 976, 984 (4th Cir. 2015), *quoting McLeod v. Stevens*, 617 F.2d 1038, 1040-41 (4th Cir. 1980) (declining to grant a Rule 15(b)(2) motion to add an unpled claim.); *with In re Crawford*, 841 F.3d 1 (1st Cir. 2016) (plaintiff allowed post-trial amendment of a § 727(a)(4) proceeding to include an instance of material omission not mentioned in the complaint). Given the limited nature of the new "issue," it is appropriate to allow motion to amend.

Rule 15(b) was designed "'to avoid the tyranny of formalism' and 'avoid the necessity of a new trial. . . .'" Wright & Miller, 6A Federal Practice and Procedure (3d ed.), § 1491, notes 5 and 6 and accompanying text; *see also In re Santa Fe Downs, Inc.* 611 F.2d 815, 817 (10th Cir. 1980 (quoting the "tyranny of formalism" language and citing Wright & Miller). If the Court denied the motion to amend, Plaintiff could bring a new claim under state law to avoid the transfers of the Additional Cars, as the state law statute of limitations is four years. N.M.S.A. § 56-10-23. Requiring Plaintiff to do that would be a waste of money for both sides.

The motion to amend is granted.

B.     Count I-Turnover.

Section 542(a) provides in relevant part:

[A]n entity, other than a custodian, in possession, custody or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

§ 542(a); *see also In re Vaughan Co., Realtors*, 2015 WL 4498748 *3 (Bankr. D.N.M. 2015) (under § 542(a), the trustee may recover property of the estate that she may use, sell, or lease).

To prevail in an action for turnover, a trustee "must prove that: 1) during the case; 2) an entity other than a custodian; 3) was in possession, custody or control; 4) of property that the trustee could use, sell or lease; and 5) that such property is not of inconsequential value or benefit to the estate." *In re U.S.A. Diversified Products, Inc.*, 193 B.R. 868, 872 (Bankr. N.D. Ind. 1995), *citing In re High Sierra Transport, Inc.,* 101 B.R. 432, 434 (Bankr. M.D. Pa. 1989). The trustee has the burden of proof. *Id.*

 1. <u>The Settlement Proceeds</u>. The Court finds that Ferguson has already turned over the Settlement Proceeds to Motiva. It is true that Ferguson could not produce an accounting record showing that the initial $10,000 (which came from WFA's account) was treated for income tax purposes as a distribution to Ferguson. However, there is no evidence to the contrary, and it is more plausible that, given the state court's order to pay the Settlement Proceeds to Motiva, Ferguson intended the $10,000 to be a partial payment of that obligation. WFA had no reason to give or loan $10,000 to Motiva. The turnover request for $10,000 of Settlement Proceeds is denied.

 2. <u>Turbo kits on hand</u>. The pipe kits on hand on the petition date were turned over. The turnover request for these pipe kits will be denied.

 3. <u>Turbo kits previously sold</u>. A number of pipe kits were sold, and turbocharger systems installed, pre-petition. The Court finds that Plaintiff did not carry his burden of proving that the kits were owned by Motiva, so no turnover of the sales proceeds will be ordered.

C. <u>Count II-Fraudulent Transfer; § 548(a)(1)(A)</u>.

 Under § 548(a)(1)(A), the trustee may avoid certain transfers within two years of the petition date if done with the "actual intent to hinder, delay, or defraud" creditors. In determining whether a transfer was done with the required intent, bankruptcy courts consider certain "badges of fraud," from which intent may be reasonably inferred. In *In re Taylor*, 133 F.3d 1336, 1338

-18-

(10th Cir. 1998), the Tenth Circuit listed the following, taken from the Uniform Fraudulent

Transfer Act:

> (a) the transfer or obligation was to an insider;
> (b) the debtor retained possession or control of the property transferred after the transfer;
> (c) the transfer or obligation was disclosed or concealed;
> (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (e) the transfer was of substantially all the debtor's assets;
> (f) the debtor absconded;
> (g) the debtor removed or concealed assets;
> (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

133 F.3d at 1338; *see also In re All Phase Roofing and Construction, LLC*, 2020 WL 5512500, at

*5 (10th Cir. BAP 2020) (unpublished) (citing *Taylor*); *In re Kendall*, 491 B.R. 191, at *5 (10th

Cir. BAP 2013) (unpublished) (same).

The Court weighs the factors, as they relate to the Subject Cars, as follows:

| Badge | Discussion |
| --- | --- |
| (a) the transfer or obligation was to an insider; | All Subject Cars were transferred to insiders. |
| (b) the debtor retained possession or control of the property transferred after the transfer; | Ferguson retained possession and control of the Subject Cars after the transfers. |
| (c) the transfer or obligation was disclosed or concealed; | None of the transfers were disclosed on debtor's SOFA. |
| (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; | The transfers were made after the Butler jury verdict was entered. |
| (e) the transfer was of substantially all the debtor's assets; | The transfers left Motiva with worthless accounts receivable and nothing else. |
| (f) the debtor absconded; | Motiva did not abscond, but it went out of business. |
| (g) the debtor removed or concealed assets; | The only removal or concealment was the undisclosed transfer of the Subject Cars. |

| | |
|---|---|
| (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; | Motiva got no value whatsoever. |
| (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; | Motiva was insolvent before the transfers were made, even if the acquisition cost of the Subject Cars is added to Motiva's balance sheet. After the transfers, Motiva had no valuable assets and liabilities of more than $2,000,000. |
| (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and | The initials transfers occurred shortly after the Butler jury verdict was entered. |
| (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. | N/A |

Weighing the "badges of fraud," the Court concludes that the Subject Cars were transferred with the actual intent to hinder, delay, or defraud creditors. Plaintiff has carried his burden of proving the estate's right to relief under § 548(a)(1)(A) with respect to the Subject Cars.

Defendants argue that no transfer occurred because Motiva did not own the Subject Cars. In support of this argument, Defendants point out that Ferguson, not Motiva, paid for the cars. That is true, but not dispositive. When it comes to the serious business of paying taxes, the law does not permit a taxpayer to say one thing to the taxing authorities and the opposite to someone else. For example, in *NOA, LLC v. El Khoury*, 2017 WL 11566799, at *5 (E.D.N.C.), the district court held:

> Under the doctrine of quasi-estoppel, "[a] taxpayer may be barred from taking one factual position in a tax return and then taking an inconsistent position later in a court proceeding in an effort to avoid liability based on the altered tax consequences." *Route 231, LLC v. C.I.R.*, 810 F.3d 247, 258–59 (4th Cir. 2016). Accordingly, a taxpayer remains bound in later litigation by factual representations asserted in a tax return. Id. at 259.

Similarly, in *Alamo Nat'l Bank v. Comm'r*, 95 F.2d 622, 623 (5th Cir. 1938), the Fifth Circuit held:

> It is no more right to allow a party to blow hot and cold as suits his interests in tax matters than in other relationships. Whether it be called estoppel, or a duty of consistency, or the fixing of a fact by agreement, the fact fixed for one year ought

to remain fixed in all its consequences, unless a more just general settlement is proposed and can be effected.

Again, in *Janis v. Comm'r*, 461 F.3d 1080, 1085 (9th Cir. 2006) the Ninth Circuit said:

"'[T]he duty of consistency not only reflects basic fairness, but also shows a proper regard for the administration of justice and the dignity of the law. The law should not be such a[n] idiot that it cannot prevent a taxpayer from changing the historical facts from year to year in order to escape a fair share of the burdens of maintaining our government. Our tax system depends upon self assessment and honesty, rather than upon hiding of the pea or forgetful [equivocation].'"

461 F.3d at 1085, quoting *Estate of Ashman v. Comm'r*, 231 F.3d 541, 544 (9th Cir. 2000); s*ee also Government of Guam v. Guerrero*, 2018 WL 4604005, at \*2 (D. Guam) (taxpayer has a 'duty of consistency" with regard to his position on tax issues), citing *Estate of Ashman v. CIR*, 231 F.3d 541, 543 (9th Cir. 2000); *Route 231, LLC v. C.I.R.*, 810 F.3d 247, 258 (4th Cir. 2016) ("The bottom-line principle remains constant: A taxpayer may be barred from taking one factual position in a tax return and then taking an inconsistent position later in a court proceeding in an effort to avoid liability based on the altered tax consequences of the original position.").

Applying this sensible and fair principle, Ferguson is barred from telling this Court that Motiva does not own the Subject Cars, because he previously represented to the New Mexico Taxation and Revenue Department that Motiva *did* own them. Any other rule would result in a free-for-all with the truth, sanctioned by the courts. Ferguson made his bed when he avoided paying excise tax on the Subject Cars. Now he must lie in it.

The amount of the judgment will be the acquisition cost of the cars, based on Ferguson's trial testimony that he has "always made money buying and selling cars." The Court has no reason to question that statement, so using the acquisition cost is fair and reasonable. Had Ferguson used his expertise to sell the Subject Cars to arms-length third party buyers in November 2018, the Court finds that he would have been able to realize, in general, the acquisition cost of the cars.

The judgment against Dealerbank will be for the acquisition cost of the Rolls Royce ($130,000); the Packard ($222,000); the 1969 Jaguar XK-E (5905) ($38,166); the Ferrari FF ($200,000 ); the 1970 Jaguar XK-E (7933) ($49,000), and the Ferrari California ($125,000); giving credit, however, for the $93,000 Plaintiff realized from selling the Ferrari FF, and also for the Settlement Proceeds.[14] The net is $630,216.

The judgment against Ferguson will be for the acquisition cost of the two Jaguar XK-Es (4796 and 3591) transferred to him in August 2019: $46,601 + $45,000 = $91,601.

The judgment against Armageddon will be for the value of the Toyota Tundra, $3,500.

The Court finds that Plaintiff did not carry his burden of proving that the turbo kits were fraudulently transferred from Motiva to Turbo because, inter alia, the most reasonable date of transfer, March 3, 2017, is outside of the state or federal "lookback" period.

D.      Count III-Fraudulent Transfer; § 548(a)(1)(B).

Section 548(a)(1)(B) provides in pertinent part:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
. . . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

_____

[14] Plaintiff sold the Ferrari FF on April 7, 2021, about 2 ½ years after the transfer from Motiva to Dealerbank.

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

The Trustee has the burden of proof to recover under § 548(a)(1)(B). *In re Jordan*, 392 B.R. 428, 440 (Bankr. D. Id. 2008). To sustain a cause of action under § 548(a)(1)(B),

[t]here must be a "transfer" of property of the debtor that occurs within two years of the filing of the bankruptcy petition. The debtor must have received less than "reasonably equivalent value in exchange for the transfer" and the transfer had to have occurred when the debtor was insolvent or the debtor had to be rendered insolvent as a result of the transfer.

*Jordan*, citing *Krommenhoek v. Natural Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.),* 166 B.R. 701, 703 (Bankr. D. Idaho 1994).

The Court finds that Motiva was insolvent when the challenged transfers were made; that Motiva was engaged in a business for which its remaining property was unreasonably small; and that Motiva had incurred debts beyond its ability to pay. The Court further finds that Motiva did not receive any, let alone reasonable, value in exchange for the transfers. The Court will enter judgment against the transferees of the Original Cars in the amount of the same vehicles values as in Count II.[15]

E.    Count IV-Fraudulent Transfer; NMSA § 56-10-18(A)(1).

NMSA § 56-10-18(A) provides:

A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor[.]

When ruling on a claim under NMSA § 56-10-18(A)(1), courts use the same "badges of fraud" as with § 548(a)(1)(A). Given the Court's findings for Count II, the result is the same for

---

[15] Plaintiff did not seek to add the Additional Cars to Counts III or V.

Count IV. The Court will not award punitive damages because the compensatory damages awarded are sufficient to pay creditors in full.

F.    Count V-Fraudulent Transfer; NMSA § 56-10-18(A)(2).

NMSA § 56-10-18(A)(2) provides that a transfer made or obligation incurred by a debtor is voidable if the debtor made the transfer or incurred the obligation

> without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>   (a) was engaged or was about to engage in business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>   (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The Plaintiff bears the burden of proving that the transferor received less than a reasonably equivalent value in exchange for the transfer. *In re Vaughan Co., Realtors*, 477 B.R. 206, 221 (Bankr. D.N.M. 2012). Given the Court's findings in Count III, Plaintiff is entitled to a similar judgment on Count V.

G.    Count VI-Breach of Fiduciary Duty.

Management owe fiduciary duties to a corporation and its shareholders. *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007). "As a general matter . . . a fiduciary relationship imposes a duty on the fiduciary that is greater than the duty of good faith and fair dealing implied in all contractual relationships." *Mayeux v. Winder*, 139 N.M. 235, 243-44 (Ct. App. 2005), *citing Walta v. Gallegos Law Firm, P.C.,* 131 N.M. 544 (Ct. App. 2002). Management must discharge their duties with due care, good faith, and loyalty. *Gheewalla*, 930 A.2d at 101.

Plaintiff's breach of fiduciary duty claim relates to the handling of the turbo project assets. Because Motiva was so heavily involved in the turbo project, Plaintiff argues that Motiva owned

the tangible and intangible project assets and should have been compensated when they were assigned to Turbo. In particular, Plaintiff argues that Motiva paid $656,565 for turbo pipe kits between October 2015 and November 2016. The invoices show that the kits were sold to "Armageddon Turbo System" at Motiva's address. With one exception, the kits were shipped to Motiva's address in Albuquerque. The kits were called "Motiva Armageddon Twin Turbo Kits." The tax treatment of the payments was discussed above.

This is a difficult situation and a close call. There is no excuse for handling a significant new business endeavor like the turbo project as sloppily and informally as it was. Likewise, there is no excuse for relying so heavily on a company (Motiva) to develop the project while claiming it has no interest in it. Ultimately, the Court is swayed by Ferguson's tax treatment of the project expenses. Clearly, in 2016 the cost of the turbo project was treated as a Motiva expense on Ferguson's tax return. It appears that 2017 and 2018 were similar. Then, in 2020, when Turbo finally is scheduled as a separate entity, Ferguson represents that he acquired the business in 2020. The Court finds and concludes that at least until March 3, 2017, and perhaps later, the turbo project was a Motiva asset.

At some point after Turbo was organized, the pipe kits, intellectual property, and other assets of the turbo venture became Turbo's assets. The Court finds and concludes that Ferguson breached his duty of loyalty to Motiva by transferring the turbo project assets to Turbo without obtaining reasonable compensation for Motiva. Because the only verifiable number about the value of the turbo project when Motiva claimed to own it is $575,082 (per Motiva's Schedule C), the Court will enter judgment for that amount against Ferguson.

The Court will not give Plaintiff a judgment against Rochau for breach of duty. Rochau is a smart man and a talented mechanic/engineer, but it is obvious from his testimony that he relied

on Ferguson to make the important legal and strategic decisions for Motiva and Turbo. Ferguson had complete control of the entities, both legally and financially. Rochau had no ability to question or dispute Ferguson's decision to give all of the turbo assets to Turbo without compensating Motiva. Had Ferguson carefully separated Motiva from the turbo project in 2011, the Court is sure Rochau would have been happy to go along. The mishandling of the Motiva/Turbo relationship was Ferguson's doing, not Rochau's.

H.     Count VII-Alter Ego/Veil Piercing.

Ordinarily, a corporation will "be treated as a legal entity separate from its shareholders." *Scott v. AZL Resources, Inc.*, 107 N.M. 118, 121 (S. Ct. 1988).[16] Under this rule, individual shareholders cannot be held personally liable for the corporation's debts. *Id*. However, courts may "pierce the corporate veil" when "the corporation was set up for fraudulent purposes or where to recognize the corporation would result in injustice." *Id.*

The doctrine is applied to "cases in which corporate organization was resorted to accomplish fraud, or to defeat public justice or to circumvent statutes...." *State Trust & Sav. Bank v. Hermosa Land & Cattle Co.*, 30 N.M. 566, 577 (S. Ct. 1925). "The corporate entity will be disregarded by the court when the corporation is used to perpetrate fraud or promote injustice." *Scott Graphics v. Mahaney*, 89 N.M. 208, 211 (Ct. App. 1976). "[W]here corporate entity is employed as a shield to defraud creditors or otherwise perpetrate frauds, the veil of corporate existence will be drawn aside and liability imposed on its stockholders as though there were no corporate existence." *Kutz Canon Oil & Gas Co. v. Harr*, 56 N.M. 358, 367 (S. Ct. 1975). Judge

---

[16] The rules for veil piercing are the same for limited liability companies as they are for corporations. *See, e.g., TransFirst, LLC v. Brown*, 323 F.R.D. 641, 653 (D. Colo. 2018), quoting *Griffith v. SSC Pueblo Belmont Operating Co. LLC*, 381 P.3d 308, 313 (Colo. 2016) (same veil-piercing rules apply for limited liability companies).

Hartz stated in his concurrence in *Garcia v. Coffman*, 124 N.M. 12, 23 (Ct. App. 1997), that "[o]ne commentator has summarized the case law by stating that "courts regularly disregard the entity when its *separateness* is used for illegitimate purposes." Robert B. Thompson, *Piercing The Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036, 1041 (1991) (emphasis added).

To pierce Motiva's corporate veil, Plaintiff must show instrumentality or domination; improper purpose; and proximate cause. *Harlow v. Fibron Corp.*, 100 N.M. 379, 382 (Ct. App. 1983); *Scott Graphics*, 89 N.M. at 121 (citing *Harlow*).

   1. <u>Instrumentality</u>. "'Instrumentality' or 'domination' means proof that the subsidiary or other subservient corporation was operated not in a legitimate fashion to serve the valid goals and purposes of that corporation but it functioned instead under the domination and control and for the purposes of some dominant party." *Scott*, 107 N.M. at 121. In New Mexico, the "instrumentality" or "domination" requirement is referred to as the "alter ego doctrine." *Id.* Some factors for courts to consider when determining whether a corporation is the alter ego of another are:

> (1) The parent corporation owns all or majority of the capital stock of the subsidiary.
> (2) The parent and subsidiary corporations have common directors or officers.
> (3) The parent corporation finances the subsidiary.
> (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.
> (5) The subsidiary has grossly inadequate capital.
> (6) The parent corporation pays the salaries or expenses or losses of the subsidiary.
> (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.
> (8) In the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division.
> (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation.
> (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

Case 21-01026-t Doc 105 Filed 10/07/22 Entered 10/07/22 15:42:52 Page 27 of 34

*Cruttenden v. Mantura*, 97 N.M. 432, 434-35 (S. Ct. 1982), citing *Intern. U., United Auto., Etc. v. Cardwell Mfg. Co.*, 416 F. Supp. 1267, 1286 (D. Kan 1976), quoting *Fish v. East*, 114 F.2d 177, 191 (10th Cir. 1940). The Court weighs the *Cruttenden* factors as follows:

| Factor | Discussion |
| --- | --- |
| (1) The parent corporation owns all or majority of the capital stock of the subsidiary. | Ferguson owned the majority of Motiva and exercised complete control over it. |
| (2) The parent and subsidiary corporations have common directors or officers. | Ferguson was the sole manager of Motiva at all relevant times. Even when the manager title was bestowed on Rochau, Ferguson continued to sign as Motiva's manager. |
| (3) The parent corporation finances the subsidiary. | Ferguson financed Motiva and was its sole source of support. |
| (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. | Ferguson organized Motiva. |
| (5) The subsidiary has grossly inadequate capital. | Motiva was always substantially insolvent on a balance sheet basis. By the time it filed this case, its liabilities exceed its assets by more than $2,000,000. |
| (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. | Ferguson funded all of Motiva's losses. |
| (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. | Motiva's assets were purchased with a loan from Ferguson. |
| (8) In the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division. | N/A |
| (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. | Ferguson, at the sole manager, controlled Motiva at all relevant times. |
| (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed. | Motiva never had an operating agreement, minute book, or other corporate documents. The only corporate record is the articles of incorporation. |

The *Cruttenden* factors weigh heavily in favor of finding and concluding that Motiva was Ferguson's alter ego.

In addition, alter ego also is shown by Ferguson's decision to mount a joint defense in the State Court Action when Butler added Ferguson, Dealerbank, and Turbo as "relief defendants." Motiva's interest was to claim the Ferrari FF and the other cars as assets. Ferguson instead forced Motiva to disclaim any ownership interest. Ferguson used Motiva for his own ends, contrary to Motiva's interests.

The Court finds and concludes that Motiva, Armageddon, Avatar, and Dealerbank were the alter egos of Ferguson, acting under Ferguson's domination and control and used for his purposes.

2.    Improper purpose. The improper purpose requirement ensures that a shareholder is not held liable based on control alone. *Scott*, 107 N.M. at 121. Instead, "[s]ome form of moral culpability attributable to the [shareholder], such as use of the [corporation] to perpetrate a fraud is required." *Id.* at 122; *see also Garcia v. Coffman*, 124 N.M. 12, 17 (Ct. App. 1997) (listing examples of improper purpose). Undercapitalization "is also a factor to be considered in determining whether there was an improper purpose." *Harlow*, 100 N.M. at 383.

Ferguson used Motiva and his other companies for improper purposes, including improper avoidance of excise taxes, income taxes, and creditor claims.

a.    Excise Taxes. Ferguson used Motiva to avoid paying state excise taxes by claiming that Motiva owned cars that Ferguson intended to be part of his private collection. The full extent of Ferguson's use of Motiva's dealer license to avoid excise taxes is not in the record, but the evidence before the Court shows that Motiva acted as a "front" for Ferguson in the purchase of at least 23 cars, with a total purchase price of about $1,400,000. Assuming an average excise tax rate of 3.5%, Ferguson avoided paying about $49,000 in excise taxes on these cars. Willful

evasion of the excise tax is a criminal offense in New Mexico, NMSA § 7-1-72, as is tax fraud. NMSA § 7-1-73.

Ferguson also used Motiva to evade excise taxes by "selling" the cars in Motiva's name to Ferguson affiliates for much less than their real value. Ferguson carried the cars on his internal books for what he paid for them, but declared much lower values when he decided he had to title the vehicles in an affiliate's name. Given Ferguson's testimony that he had "always made money buying and selling cars," the Court concludes that Ferguson understated the values of the transferred cars to avoid paying the full excise tax due.

           b.    <u>Income Taxes</u>. Ferguson declared that Motiva was a sole proprietorship on his income tax returns, allowing him to deduct all of its losses. Between 2016 and 2020, Ferguson deducted $1,289,941 from his income for Motiva's losses.[17] At the time, he owned 65% of Motiva, not 100%. His deduction therefore was overstated by $451,479. At a 37% marginal tax rate,[18] the result is an improper reduction of $167,047 in federal income tax, together with an analogous underpayment of state income taxes. Ferguson's accountant, Mr. Kirkpatrick, credibly testified that Motiva should have filed income tax returns and issued K-1s to Ferguson and Rochau. He also credibly testified that Ferguson and Rochau could have entered into a membership or operating agreement that allocated profits and losses at variance from membership interests, but that was never done.

---

[17] The deduction in 2020, a loss of $40,950, is particularly troubling. The loss was based on payment of the Settlement Proceeds from Ferguson to Motiva. As the proceeds were compensation for property damage, they likely were not taxable income. In any event, they were not a taxable loss.

[18] At relevant times, this is the marginal tax rate for married couples with taxable income of more than $650,000.

There is a similar problem with Turbo. In 2020 Ferguson took a $187,210 deduction for Turbo's operating results, declaring that he was the sole owner. The trial testimony of Ferguson and Rochau conflicts with this.

Federal income tax evasion is a serious matter. *See* 26 U.S.C. § 7201.

   c. <u>Creditor Claims</u>. An additional improper purpose was Ferguson's use of his entities to avoid paying creditor claims. Shortly after the Butler jury verdict was handed down, Ferguson caused Motiva to transfer five cars to Dealerbank for no consideration. The next month, Ferguson claimed that Avatar had a landlord's lien on the 50 boxes of pipe kits. Ferguson later changed that story and asserted that the kits were owned by Turbo, not Motiva. Ferguson then caused his entities to hire WFA and assert a joint defense against Butler's collection efforts, despite the fact that the position taken significantly harmed Motiva. Meanwhile, Ferguson transferred title to five other cars from Motiva to a third party (one car) and affiliates (four cars). Again, Motiva received nothing from the transfers. The upshot of Ferguson's post-judgment maneuvering was that Motiva, always undercapitalized, was stripped of all assets. It was only the state court's ruling in the Butler case that brought the Ferrari FF, the Settlement Proceeds, and the pipe kits into the bankruptcy estate.

   d. <u>Lack of Minimal Formalities</u>. A common theme running through Motiva, Turbo, Avatar, and Armageddon is a lack of expected and customary business formalities. Examples abound: Ferguson operated 30 businesses out of Armageddon's checking account; Ferguson did not document profit and loss and/or membership allocation agreement with Rochau or other members; Turbo operated for six years before it was organized; neither Motiva nor Turbo had records of membership interests and transfers; and Turbo used a Motiva bank account for years. Ferguson, an experienced lawyer and businessman, clearly knew how to properly document

a business organization, but chose not to do so with his key businesses. The Court finds that Ferguson was intentionally lax, as it gave him greater latitude to revise history if needed. It is not illegal to run your businesses this way, nor is it necessarily improper, if the owner does not use the informality to his or her unfair advantage. Here, Ferguson misused the informality and laxness for his benefit and to the detriment of the taxing authorities and Motiva's creditors.

3.    Proximate Cause. Proximate cause is demonstrated by evidence of "some knowing or cooperative effort between the related parties which results in unjust injury to the plaintiff, even though it may not be possible to prove that the defendant's control directly caused [the] plaintiff's injury." *Coffman*, 124 N.M. at 17 (quoting Cathy S. Krendl & James R. Krendl, *Piercing the Corporate Veil: Focusing the Inquiry*, 55 Denver L.J. 1 (1978); *see also Acheff v. Lazare*, 2014 WL 894491, at *9 (D.N.M.) (quoting *Coffman*). The Court finds and concludes that the cooperative effort of Ferguson, Motiva, Dealerbank, Armageddon, and Turbo unjustly stripped Motiva of its valuable assets, i.e., the turbo project assets and the Subject Cars, proximately causing harm to Motiva's creditors.

Before the Butler judgment Motiva had, inter alia, about $900,000 worth of cars in its name. This value was an unintended byproduct of Ferguson's improper use of Motiva's dealer license. When the Butler judgment was entered, Motiva could have paid it with relative ease by selling a portion of the Subject Cars in its name. Independent owners (or a bankruptcy trustee) would have done this. Because Motiva was Ferguson's alter ego, however, it took the opposite course, fraudulently transferring the Subject Cars to Ferguson affiliates for no consideration. Creditors were left high and dry.

Ferguson benefitted from Motiva "fronting" for him in the purchase of the Subject Cars. Once the front no longer helped Ferguson, he changed course, telling everyone except the Department that Motiva did not and had never owned the cars.

Ferguson's willingness to change his story to fit the needs of the moment was not lost on the state court or the New Mexico Supreme Court. It troubled them that Ferguson, a wealthy, talented, and experienced attorney, would operate so blatant a shell game to avoid paying taxes and debts.

The improper purposes for which Ferguson used Motiva, Turbo, Armageddon, and his other instrumentalities harmed Butler and Motiva's other creditors. All creditor claims against Motiva should have been paid in full. Instead, creditors found they had claims against an empty shell.

The Court also finds and concludes that Ferguson kept Motiva's doors open, despite chronic insolvency and substantial losses, so he could use its dealer license to buy cars, and also so he could write off 100% of its and Turbo's operating losses. Without these improper benefits, Ferguson likely would have shut Motiva's doors before Butler brought his Hummer to the shop in February 2014. Ferguson admitted at trial that there isn't a market for a high-end speed shop in Albuquerque, New Mexico, which is why Motiva failed. The decision to keep Motiva open despite its flawed business model proximately caused Butler's loss.

The Court will pierce the veil between Motiva and Ferguson and hold Ferguson liable for Motiva's debts. Doing so will prevent Ferguson from using Motiva "as a shield to defraud creditors or otherwise perpetrate frauds." *Kutz Canon Oil*, 56 N.M. at 367. The Court will not hold Rochau or Fox liable for Motiva's debts, however, because they did not have any control over Motiva or use it for any improper purpose.

I.    Count VIII-Disallowance of Claims.

Section 502(d) provides in pertinent part, the Court "shall disallow any claim of any entity from which property is recoverable under section . . . 550 or . . . is a transferee of a transfer avoidable under section . . . 548 . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable . . . ."

Based on the foregoing, the Court will disallow the claims of Ferguson, Dealerbank, and Armageddon until they pay the judgments against them in full.

## CONCLUSION

Ferguson is a smart and successful attorney, entrepreneur, and car collector. He has worked hard, done very well for himself, and has earned credit and respect from many, including this Court. Given his questionable use of Motiva's dealer license to buy cars for his collection, however, and his questionable handling of Motiva's and Turbo's expenses on his personal income tax returns, Ferguson would have been well advised to pay the Butler judgment when it was handed down and chalk up the loss to experience. His refusal to do so led directly to unfortunate findings and ruling by the state court, the New Mexico Supreme Court, and this Court. A final judgment will be entered in accordance with this opinion.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: October 7, 2022
Copies to: Counsel of record